**PROGRESSIVE INSURANCE COMPANY (PAGO PAGO) LTD.,**
**Plaintiff,**

**v.**

**SOUTHERN STAR INTERNATIONAL, INC., dba HONG KONG RESTAURANT, KENNY AND HELEN YOUNG, AINOAMA FATA dba NOFO'S STORE, AND DOES I-V, Defendants.**

High Court of American Samoa
Trial Division

CA No. 129-99

April 3, 2002

━━━━━━

━━━━━━

Before KRUSE, Chief Justice, and LOGOAI, Chief Associate Judge.

Counsel: For Plaintiff, Roy J.D. Hall, Jr.,
 For Defendant Ainoama Fata, Katopau T. Ainu`u
 For Defendants Southern Star International, Inc., dba Hong
 Kong Restaurant, and Kenny and Helen Young, Paul F. Miller

## OPINION AND ORDER

This case arose as the result of fire damage sustained to a commercial building containing the Hong Kong restaurant (the "restaurant building") that was insured against the loss by plaintiff Progressive Insurance Company ("Progressive").

## Procedural History

On December 8, 1999, Progressive filed this interpleader complaint, joining defendants Southern Star International ("SSI"), Kenny and Helen Young ("the Youngs"), and Ainoama Fata dba Nofo's Store ("Fata") as parties having adverse claims against Progressive and each other for proceeds from a $100,000 fire/material damage policy for the restaurant building.[1] At the time, Progressive determined $64,300 to be its liability under the insurance policy at issue, depositing this amount with the Clerk of Courts. Later, as these proceedings advanced, Progressive repudiated any liability for the loss, on the changed legal theory that none of the parties had an insurable interest in the property, as mandated by A.S.C.A. §§ 29.1520 *et seq*.

SSI and the Youngs answered the complaint on December 30, 1999, and, Fata responded to the interpleader on March 30, 2000. In their answer, SSI and the Youngs counter-claimed against Progressive asserting claims of breach of contract, indemnification, statutory violation, and breach of the duty of good faith. Fata cross-claimed against SSI and the Youngs on a related claim asserting indemnification in accordance with the terms of a June 24, 1998, lease agreement. On April 7, 2000, the court found that the interpleader requisites had been met, and certified the complaint as one for interpleader. Although a disinterested stakeholder in interpleader is customarily released at the certification stage of interpleader, the Court declined to discharge Progressive from the case given the counter-claims lodged against it by SSI and the Youngs. In any event, Progressive is no longer a disinterested stakeholder given its changed theory that none of the parties were legally entitled to the court deposited money.

Trial was held on May 11, and 14 through 16, 2001, with all counsel for the parties present. Written closing arguments were submitted, as ordered by the court, on or before June 1, 2001, and the matter was taken under advisement.[2]

---

[1] Progressive also joined High Chief Falemalama Vaesa'u, the *matai* of the communal landowning family, as a co-defendant. However, the Court dismissed Falemalama, who requested dismissal, on his renouncing any interest in the policy and, therefore, in the subject matter of this suit.

[2] The Court will not consider an untimely supplementary bad faith argument by SSI and the Youngs filed on June 4, 2001. Counsel for SSI and the Youngs were present and agreed in open court to the June 1, 2001 filing deadline. Furthermore, counsel failed to request the requisite leave of this Court to submit a pleading beyond the June 1, 2001 established deadline.

## Facts

At the heart of this dispute is the interest that each defendant holds in the restaurant building, and ultimately in the restaurant building $100,000 fire/material damage insurance policy issued by Progressive. The $100,000 restaurant building policy is one component of Policy No. 000600720 ("Policy 720"), which provided fire/material damage insurance for various other personal and real property owned or leased by the Youngs including: 1) the restaurant contents valued at $50,000; 2) an adjacent building used as a residence and general store, commonly referred to as the Nu`uuli store ("Nu`uuli store"), owned by the Youngs and valued at $150,000; 3) another building leased by the Youngs, used as a fast food shop, and valued at $75,000; and 4) the fast food shop contents valued at $25,000. Policy 720 included an extensions clause, which clause will be more specifically described in a subsequent section.

### A. The Parties

Fata owned the restaurant building, which was situated on the communal land of the Falemalama family whose *sa`o* (senior *matai*), with *pule* (authority) over the land, is High Chief Falemalama Vaesa`u ("Falemalama").

On June 24, 1998, Fata and the Youngs entered into a lease for the restaurant building (the "Lease"), which was drawn up by the Youngs, and subsequently registered with the Territorial Registrar.[3] The Lease provided, *inter alia*, that the Youngs or their agents would indemnify Fata in the event of damage or loss to the building.

The Youngs formed SSI, a closely-held corporation which they solely owned and directed with their minor son, to allegedly manage the Hong Kong restaurant. However, at trial, Kenny Young admitted that SSI was created for the purpose of obtaining corporate sponsorship of the Hong Kong restaurant's alien workers.[4]

### B. The Assignment

The Youngs claim that they had assigned their leasehold interest in the restaurant building to SSI and that a written document evidencing this

---

[3] While not specifically discussed at trial, it appears that the Youngs occupied the premises prior to this date, having maintained a fire/material damage insurance policy with Progressive for the restaurant building's contents as early as 1996.

[4] A.S.C.A. § 41.0408(b)(2) allows a corporation authorized to do business in American Samoa to act as an immigration sponsor.

assignment was consumed by the fire. We, however, are unconvinced that an assignment ever existed. Apparently, Kenny Young, the author of the alleged assignment, was also the sole witness to its existence. Yet, Kenny, when queried, could not remember its wording. Furthermore, we are inclined to believe that had there been a written assignment, Kenny would have taken the pains to register and record such an important document just as he had done with the Lease itself.

## C. The Policy

In May 1999, Helen contacted Progressive requesting fire/material insurance coverage for the restaurant building, and for the Young's two other business premises. Helen dealt primarily with Progressive underwriter Tavita Taumua ("Taumua"). She testified that she had explained to Taumua that the Youngs leased the restaurant building, that Fata owned the building, and that she expected that Taumua would reflect their respective interests in the building accordingly.

Taumua must have initially noted Helen's representation as the first insurance documents referenced the Youngs appropriately. However, for reasons unknown, the Young's names were later omitted from subsequently written policy papers. In addition, Fata's name and interest in the restaurant building never appeared in any of the policy documents. At trial, Progressive General Manager Julian Ashby ("Ashby") allowed that had the true facts been known to the company prior to the loss, the Policy could have been rewritten to reflect the building owner Fata as "loss payee."

Before issuing coverage, Taumua visually inspected the premises to be insured, after which he issued the Youngs a written quote, dated May 18, 1999, outlining the requested coverage ("the Quote"). The Quote, which specifically addressed the Youngs, without mention of SSI, outlined the coverage requested and provided an estimate. Taumua quoted the Youngs the $100,000 fire/material damage building policy, and $50,000 fire/material damage contents policy, with an estimated premium of $525 for the $150,000 total restaurant building and contents coverage. Helen agreed to the terms of the quoted coverage, after which Taumua completed an insurance proposal ("the Proposal"), detailing the coverage as listed in the Quote.[5]

The Proposal mirrored the Quote insofar as the amounts of coverage remained the same, with the Youngs listed as an applicant for insurance.

---

[5] The proposal form, a Progressive pre-printed document, is worded to reflect the insurance applicant as the "proposer".

However, SSI was included with the Youngs as a co-applicant,[6] with Falemalama, not Fata, listed as the restaurant building owner. Other provisions of coverage that were not included in the Quote were further described in the Proposal. The Proposal included extensions on coverage as "including Architects Surveyor's and Consulting Engineer's fees for estimates, plans, specifications, quantities, tenders and supervision necessarily incurred in the reinstatement of the insured property following the destruction by any peril hereby insured against." It also explained that the contents coverage included leasehold improvements.

After the Proposal was issued, Ashby and Taumua, with Helen present, made a second inspection of the buildings Progressive proposed to insure. Ashby testified that as they stood in the Nu`uuli store, adjacent to the restaurant building, he asked Helen about the Youngs' interest in the restaurant building and that Helen had responded that she and her husband owned the restaurant building. Helen, on the other hand, denies ever making such a statement, or dealing directly with Ashby in regards to the issuance of Policy 720.

Soon thereafter, on or about June 2, 1999, Progressive issued the Youngs a certificate of insurance for Policy 720 ("the Certificate"). The Certificate neither included the Youngs as insured nor Fata as an interested party, naming only SSI as sole insured. Otherwise, the Certificate terms substantially mirror those included in the Quote and Proposal. More specifically, the Certificate lists the same premium payments as initially quoted to the Youngs. In addition, the language of the Certificate's last paragraph explicitly references the Proposal as a controlling descriptive document.[7] A standard form three-page policy conditions statement ("the Conditions"), detailing the conditions of coverage, was issued to the Youngs either together with the Certificate or at some later unspecified date.

Approximately three weeks after the Youngs received the Certificate, they received a summary of coverage for Policy 720 ("the Summary"). Ashby explained that the Summary detailed the coverage received under Policy 720. The Summary listed the same requested coverage as listed in

---

[6] Although the term insured is not used in the Proposal, it was undisputed that the listing of the Youngs as an additional party and SSI as "proposer" described both SSI and the Youngs as insurance applicants.

[7] The final clause of the Certificate of insurance states in bold lettering:
This certificate is issued in advance of the formal policy document and confirms that insurance coverage has been written on the abovementioned interest which is more particularly described in the proposal.

the Quote, Proposal, and Certificate, but again named only SSI as insured.

Additionally, the Summary noted for the first time in Policy 720 documentation, that Policy 720 was subject to Progressive's average clause, which is described in the Conditions document. By utilizing the "subject-to-average clause," Progressive sought to contractually narrow its liability so that it would be responsible only for the value of damage to the property proportional to the sum insured. That is, if at the time that damage occurred to the insured property, the value of the property is greater than the value of the sum insured, the insured is responsible for the difference.[8] The Summary also summarized the extensions clause. At trial, Ashby explained that the extensions clause obligated Progressive, within certain limits, to: 1) reimburse the insured for architectural-type fees; 2) pay the costs of demolition and removal of debris; 3) pay for the temporary removal of inventory items to another location following the destruction of a premises; and 4) reinstate the insurance coverage without the payment of any additional premium. The designation of property provision, an old English phrase, allowed Progressive to designate inventory in accordance with its records. Ashby stated that the extensions provision did not substitute for a loss of use policy, a distinct type of insurance policy.

D. The Fire and the Appraisal

On August 11, 1999, a fire, undisputedly started by an inattentive restaurant employee, engulfed the restaurant building, destroying the restaurant's contents and most, if not all, of its edifice. The only remnants or building standing after the fire were the building's concrete made foundation, floor slabs and walls. While the fire smoldered, Ashby appeared at the scene, where he met amicably with Kenny Young, and casually perused the damage. Kenny walked Ashby through the Nu`uuli store, showing him the peripheral damage sustained by that building. While standing on the second floor of the Nu`uuli store, and overlooking the restaurant building, Ashby commented on the destruction sustained to

---

[8] The Conditions document described the subject-to-average clause as follows:

> In all cases where an Insurance is declared to be subject to average, the following clause shall apply:
> If the property hereby insured shall, at the time of loss or damage, be collectively of greater value than the sum insured thereon then the Insured shall be considered as being his own insurer for the difference, and shall bear a rateable proportion of the loss accordingly. Every item, if more than one, of this Policy shall be separately subject to this Condition.

the restaurant building and assured Kenny that Progressive would send an adjuster from Apia to appraise the damage to the building.

Soon thereafter, Progressive enlisted Hammish G. Thew ("Thew"), a licensed "quantity surveyor," to prepare a formal evaluation of the damage. Thew's credentials include his passing a "quantity surveyor" examination in 1965, and being certified in 1983 as a quantity surveyor by the Royal Institute of Chartered Surveyors. Although Thew had assessed a number of fire claims prior to his review of the fire claim in question, his expertise as a "quantity surveyor" is specifically limited to gauging work and material needed on a given construction undertaking. He described himself as a technical accountant for the construction industry, measuring quantities of building or construction work and material. He is neither an architect nor a structural engineer.

Thew appraised the damage and ultimately concluded that the building was not a total loss, basing his conclusion on the fact that the existing foundation, concrete floor slabs, and cinder block walls could be reused to rebuild the restaurant building to its original condition. Elaborating on the method he used to reach this conclusion, Thew explained that he scratched the surface of the burned concrete with a steal nail to uncover superficial damage. Thew explained that he acquired this technique observing someone else assessing a fire loss claim in Fiji.

After his on-site review of damage, Thew produced reports reflecting the adjusted loss value of the property, or amount for which he opined Progressive was liable. To arrive at his adjusted loss figure, Thew used two methods to quantify the loss, the residual value,[9] and repair estimate methods.[10] He depreciated both values to account for the age of the building at the time of the fire. In addition, he averaged the resulting depreciated value in accordance with Progressive's subject to average clause.

Initially, in an August 23, 1999 report, Thew valued the damage at adjusted loss values of $93,605 and $86,000, using the residual value, and repair estimate methods, respectively. He also noted in his report that "[i]t would of course be an easy matter to 'massage' the figures to make them identical."

---

[9] According to Thew, the residual value method calculates the loss by subtracting the salvageable portions of the restaurant building from its depreciated value.

[10] Thew explained that the repair estimate method takes into account the approximate cost of materials and labor needed to repair the building to its original condition.

In an undated addendum report, using only the repair estimate method, Thew significantly reduced the adjusted loss value, from $86,000 to $65,045.[11] According to Thew, the residual value remained the same.

In a final report, dated November 29, 1999, by increasing the applicable depreciation factor, Thew reduced his repair estimate adjusted loss value yet again from $65,045 to $64,300.

D. The Policy 720 Claims

Shortly after the fire, Progressive attended to various claims for fire/material damage caused by the fire and covered by Policy 720.

*1. The $100,000 Restaurant Building Claim*

On August 25, 1999, Fata submitted a written claim to Progressive to include her as loss payee on the $100,000 fire/material damage coverage for the restaurant building. Concerned that Fata may have an interest in the $100,000 restaurant building coverage, and in an attempt to resolve its payment, Progressive scheduled a meeting sometime in September 1999 with Ashby, Fata, the Youngs, and their respective counsel present. After this meeting, the parties agreed to compromise that $64,300 represented their loss in the restaurant building, and agreed to divide this amount with Fata receiving $49,300, and the Youngs getting $15,000. However, just prior to executing written documentation of the agreement, the Youngs rescinded the settlement arguing that they were entitled to the $100,000 value of the restaurant building coverage. Because of this dispute, Progressive did not make any payment to the parties and, instead, sought resolution of the dispute with this Court.

*2. The $50,000 Restaurant Contents Coverage*

On or about September 14, 1999, SSI submitted on an insurer provided claim form, a detailed demand for the restaurant contents $50,000 fire/material damage portion of Policy 720. SSI's claim particularized the contents and improvements damaged, and specifically stated that all items "were burned beyond repair." On or about September 29, 1999, Progressive paid SSI $50,000 for its contents claim without incident.

---

[11] Thew explained that he reached the altered and substantially decreased amount of $65,045 after excluding the air conditioning system valued at $12,000 plus installation costs, which had been paid out with the building contents policy.

### 3. The $150,000 Nu`uuli Store Coverage

On August 18, 1999, SSI submitted a written claim to replace three damaged windows to the Nu`uuli store in the amount of $2,265. Because Progressive estimated a significantly lower cost to replace the damaged windows, Ashby questioned Kenny regarding the unexpectedly high cost of the replacement windows. Nonetheless, concerned that the Nu`uuli store interior be protected from the elements, Progressive issued the $2,265 payment to SSI's proposed window vendor on August 23, 1999, thus ensuring that the windows were immediately replaced. At the same time, unbeknown to the Youngs, Ashby asked Thew to review and appraise the damage sustained by the Nu`uuli store. Thew estimated a $2,842 adjusted loss value sustained by the Nu`uuli store, which included, amongst other things, the replacement cost of the damaged windows. Ashby did not provide Thew's appraisal to SSI and the Youngs, nor did SSI and the Youngs submit any other written claims to Progressive for other damage sustained to the Nu`uuli store.

### 4. The Extensions Clause

Neither SSI nor the Youngs made any claim with Progressive for coverage under the terms of the extensions clause. Without a written claim, Progressive did not propose to reimburse them for any of these costs. Additionally, Progressive considered that its obligation to remove debris had been satisfied by its payment in full of the $50,000 contents claim.

### E. The Aftermath

Meanwhile, without consulting Fata, the Youngs levelled and cleared the remains of the restaurant building. After demolishing the remaining foundation and walls of the building, the Youngs built a structure of larger dimension than the original building on the same site. The Youngs and Falemalama have since entered into a twenty year lease of the property.

Subsequent to the failed settlement of the $100,000 restaurant building coverage claim, Progressive filed this case with the Court, and deposited $64,300 with the Court's registry. However, as discussed earlier, after discovering the relationship between the party defendants, the existence of Fata as lessor, and the Youngs as lessee, and learning for the first time that the alleged assignment between SSI and the Youngs was at issue, Progressive disputed its liability in the $64,300 that it deposited with the Court. At trial, Progressive rescinded its claimed indifference, and asserted that the Policy was invalid for lack of an insurable interest in all three party defendants.

123

**Discussion**

Progressive argues that SSI, the Youngs, and Fata lack an insurable interest in the restaurant building. At this time, we merely note with interest one court's enunciated rule that an insurer waives its requirement for the necessity of an insurable interest in the beneficiary of an insurance policy through its payment of insurance proceeds into Court with the announcement that it stands indifferent as between the claimants. *See Lawrence v. Traveler's Ins. Co.*, 6 F. Supp. 428, 430 (Penn. 1934). Adopting this blanket principle of waiver may well conserve limited judicial resources, and further promote judicial efficiency. On the other hand, such a rule may create an excessively cautious insurer reluctant to seek judicial resolution of an insured's policy, resulting in further delay of policy payment to the detriment of the insured. In any event, we need not consider the viability of this rule with regards to this case, because we find that an insurable interest exists with respect to the Youngs and Fata.

A. Insurable Interest

 To have the capacity to insure against property damage, the insured must have an insurable interest in the covered property. A.S.C.A. § 29.1521. Without an insurable interest, a contract for property insurance will be considered void. *See* A.S.C.A. § 29.1522(c). An "insurable interest" is broadly defined in A.S.C.A. § 29.1522(a) as encompassing every interest in property, any relation thereto, or liability in respect thereto.[12] This expansive definition is circumscribed only by the last sentence which negates as non-insurable an interest that is a "mere contingent or expectant interest in anything, not founded upon an actual right to or in the thing, nor upon any valid contract for it." A.S.C.A. § 29.1522(a). The interest defined by A.S.C.A. § 29.1522(a) appears synonymous with title. However, this interest is also something less then title where A.S.C.A. § 29.1522(a) speaks of "*every* interest in property, or *any relation thereto*, or *liability in respect thereto*." A.S.C.A. § 29.1522(a) (emphasis added). On the other hand, an insurable interest is something more than a "mere contingent or expectant interest in anything." A.S.C.A. § 29.1522(a).

---

[12] A.S.C.A. § 29.1522(a) states:
*Every interest in property, or any relation thereto, or any liability in respect thereto,* of such a nature that a contemplated peril might directly damage the insured, is an insurable interest. *A mere contingent or expectant interest in anything, not founded upon an actual right to or in the thing, nor upon any valid contract for it, is not insurable.* (emphasis added).

■ Progressive urges that we adopt the rule developed by a Georgia court and define an insurable interest as requiring that the insured have some *lawful* interest in the property. *See Splish Splash Waterslides v. Cherokee Ins. Co.*, 307 S.E.2d 107, 110 (Ga. App. 1983). "While title may not always be the determinative factor, . . . the insured must have some *lawful* interest in the property before he can have an insurable interest in the property . . . although that interest may not be 'slight or contingent, legal or equitable.'" *Id.* at 110 (citations omitted). Although the legal status of an insured with respect to property is instructive as to whether or not that person has an insurable interest in the subject property, we do not think it is conclusive.

As a general rule, because property insurance policies are indemnity policies, authorities have identified this nebulous lesser-than-title, but more-than-a-contingent interest in property, in terms of a pecuniary relationship to the insured.

■ Generally speaking, a person has an insurable interest in property whenever he would profit by or gain some advantage by its continued existence and suffer some loss or disadvantage by its destruction. 3 GEORGE J. COUCH, ET AL., COUCH CYCLOPEDIA OF INSURANCE LAW 2d § 24.13 (2d ed. 1984) [hereinafter COUCH].

■ We adopt this interpretation of an insurable interest for purposes of construing that nebulous area of A.S.C.A. § 29.1522(a). Interpreting American Samoa's insurable interest statute in pecuniary terms is appropriate in the case of property insurance policies, which policies are indemnity policies that provide the insured with the right to be compensated to be made whole after a loss has been sustained.

■ SSI alleges that it was the entity that did business as the Hong Kong restaurant, and as such had a pecuniary interest in its occupation of the demised premises. To the contrary, we find that SSI was merely a corporate anomaly, questionably established to exclusively serve as an immigration conduit for the restaurant's alien workers. Even assuming its validity as an entity, the only interest SSI could have had in the building was an expectant interest in the continued employment of its sponsored aliens. An interest in a building solely because it housed a place of employment for one's sponsored foreigners cannot be said to be a reasonable expectation of the pecuniary benefit derived from the continued existence of the subject of insurance. Such an interest is merely contingent, or expectant and not a sufficient interest to be insurable.

On the other hand, we find that the Youngs, as lessees of the restaurant

building had an insurable interest in the building's preservation insofar as they covenanted in the Lease to indemnify Fata for loss or damage to the building. *See* Part E, "Fata's Cross Claim for Indemnification," *infra*. Because of their contractual promise, they suffered a pecuniary loss when the property was destroyed by fire. *See generally Simon v. Truck Ins. Exchange*, 757 P.2d 1123 (Colo. App. 1988) (finding lessee held an insurable interest in leased premises where he promised to surrender the same in the same condition); COUCH, *supra*, at § 24:60.

Finally, Fata, lessor and owner of the demised building, clearly had a pecuniary advantage in the building's preservation, and suffered loss accordingly by its destruction. *See generally id.* at § 24:59. Her interest is further evidenced in the fact that she maintained a right to be indemnified by the Youngs in the event of the building's destruction.

B. Named Beneficiary of Policy 720

Progressive further argues that even if the Youngs and Fata held insurable interests in the building, they are not named insured or beneficiaries of Policy 720, and, therefore, may not recover under the Policy. The Youngs and Fata contend that they were intended beneficiaries under the explicit terms of Policy 720. We must, therefore, look to the true intention of the parties to Policy 720.

■ Before we can construe the terms of Policy 720 to determine who was intended to benefit under the contract, we must first determine which writings, amongst the numerous policy documents, comprise the contract for insurance. A few rules of contract construction are applicable. *See Milwaukee Mechs. Ins. Co. v. Davis*, 198 F.2d 441, 444-45 (5th Cir. 1952) (construing an insurance policy like other contracts).

■ An application or proposal for an insurance policy becomes a part of the contract if it is made a part thereof by the express terms of the policy. *See Harris v. State Farm Mut. Auto. Ins. Co.*, 232 F.2d 532, 537 (6th Cir. 1956). Furthermore, even if a writing is not specifically referenced in another writing as being part of the contract, but the two were written as part of the same transaction, they should be read together as forming the contract. *See Hutson v. Chambless*, 300 S.W.2d 943, 946 (Tex. 1957).

In this case, the Proposal is part of Policy 720 where it is specifically referenced in the Certificate, and was written together with the Certificate, and the Summary as part of the same transaction. When read together, these documents seemingly contain conflicting descriptions of the insured; the Proposal referencing both SSI and the Youngs, and the Certificate and Summary naming only SSI.

126

The Certificate, however, unequivocally refers to the proposal as "more particularly" describing the interest upon which the coverage was written. Construing the language in these writings together, and the emphasis given the interest described in the Proposal, we find that the Proposal governs whom the parties intended to be insured under Policy 720. Clearly, the Youngs, who are listed as co-applicants for insurance in the Proposal, are an intended insured under the Policy.

Although the Proposal references the building owner, Fata is not named as the owner. Instead, the Proposal erroneously names Falemalama as the building owner. In telling Progressive agent Taumua that Fata owned the building, Helen expected that Progressive would accurately reflect Fata's interest in the Policy as the lessor and owner of the restaurant building. However, Progressive's agent inadvertently erred in filling out the Proposal naming Falemalama as building owner, rather than Fata.

■■ Another applicable rule of contract construction provides that a court may reform an insurance contract upon proof of a mutual mistake between the parties. *Woodruff v. O'Dell*, 701 P.2d 112, 114 (Colo. App. 1985). Such a mistake must be one which is reciprocal and common to both parties. *Id.* In contracting for Policy 720, neither party intended that Falemalama, the land owner, be named as building owner, and therefore, mutually erred in writing the Policy. To reflect the true intent of the parties to the Policy, we reform Policy 720 to reflect that Fata, rather than Falemalama, owned the restaurant building, and maintained a right to be indemnified for damage to, or loss of, the building.

Moreover, we reform Policy 720 to reflect Fata as a loss payee beneficiary of the Policy. Any interest that the Youngs have in the restaurant building is inextricably tied to their duty to indemnify Fata in the event of damage or loss to the building. Had all the relevant facts been known in the first instance, the fact that the Youngs' interest as insured under the policy was premised on their duty to indemnify Fata in the event of damage or loss to the property, would have undoubtedly been noted on Policy 720.

C. Misrepresentation

Without specificity, Progressive argues that Helen's misstatement to Ashby that the Youngs owned, rather than leased the restaurant building, nullified the contract. We construe Progressive's argument as one to void the contract for misrepresentation in accordance with the terms of the Policy.

The Conditions document provides that Progressive shall not be liable on the contract "if there be any material misdescription of the property . . .

or any misrepresentation as to any fact material to be known for estimating the risk."

As stated, a statement is a misrepresentation acting to nullify Policy 720 only if it regards a *fact material to be known for estimating the risk*. Otherwise, it is not a misrepresentation within the meaning of Policy 720.

> As the representation is a statement made to furnish the insurer the information necessary to decide whether to accept the risk and what premium to fix, it is apparent that by definition a representation relates to a fact actually material to the risk which the insurer is asked to assume. If the statement does not relate to a fact material to the risk it is not a "representation" within the sense that if it is false it affords the insurer a basis for avoiding the contract.

COUCH, *supra*, at § 35.80 (citations omitted).

Clearly, Helen's statement did not pertain to a fact material to be known for estimating the risk. Her statement did not affect Progressive's decision to insure the restaurant building, nor its decision to charge the proposed premium. After Ashby was told that the Youngs' owned the building, Progressive subsequently issued SSI the Certificate and attendant schedule of payments without any change in the premium amount or payment schedule. Had Progressive truly relied on Helen's statement, Progressive would have logically continued to name the Youngs in subsequent policy documentation since Ashby testified that he then believed the Youngs to be the true owners of the restaurant building. Instead, they subsequently omitted the Youngs' names from the Certificate and Summary. Because Helen's statement was not material to be known for estimating the risk, it was not a misrepresentation within the meaning of Policy 720.

Furthermore, the evidence suggests that Helen unintentionally erred when she informed Ashby that the Youngs owned the building. Helen seemingly placed minimal significance on her discussion with Ashby, stating that she never dealt with Ashby directly. Except for that single encounter with Ashby, Helen negotiated Policy 720 with Taumua, to whom she maintained the true nature of the Youngs interest in the building. Additionally, because the discussion took place while they stood in the Nu'uuli store, a building the Youngs did own, Helen most likely adverted mistakenly to the Young's interest in the store building rather than their interest in the restaurant building.

D. SSI and the Youngs' Counter-Claims

SSI and the Youngs presented their counter-claims without organized theories of law, or supporting case law, apparently considering it this Court's duty to decipher their arguments for them. As aptly stated in a previous decision of this Court, "[we are] . . . not paid to be an advocate for either side, nor to do legal research that should be done by the attorneys, nor to guess at or construct the legal theory upon which a losing party might oppose our decision." *G.M. Meredith and Assocs. v. Blue Pac. Mgm't Corp.*, 28 A.S.R.2d 1, 2 (Trial Div. 1995). Nonetheless, in an attempt to do substantial justice, we construe the pleadings liberally and to this extent read the claims lodged by SSI and the Youngs against Progressive as follows:

*1. Statutory Claim*

SSI and the Youngs complain that Progressive delayed in paying portions of Policy 720 in violation of A.S.C.A. § 29.1577. First, SSI and the Youngs seemingly complain that Progressive delayed in making payment under certain unspecified provisions of Policy 720. Second, SSI and the Youngs argue that Progressive delayed in paying the restaurant building $100,000 fire/material damage coverage by filing this interpleader action. We treat each contention in turn.

 A.S.C.A. § 29.1577 is a penalty statute, imposing a 12% mandatory penalty upon a dilatory insurer.[13] A.S.C.A. § 29.1577 prescribes that an insurer pay a legitimate claim within the time specified in the policy.[14] The statute also provides that an insurer's duty to pay is triggered only after an insured has made a demand to the insurer.

Policy 720 allows an insured a 15-day time-frame for filing a damage

---

[13] In a summary judgment decision in *Paisano's Corporporation v. N.P.I.*, we spoke of A.S.C.A. § 29.1577, in dicta, as a strict liability statute. 30 A.S.R.2d 139, 141 (Trial Div. 1996). However, unlike the question presently before us, the interpretation of A.S.C.A. § 29.1577 was not directly before us in *Paisano's*. Rather, our decision in *Paisano's* focused on whether a separate tort cause of action existed for bad faith delay in light of the enactment of A.S.C.A. § 29.1577.

[14] A.S.C.A. § 29.1577 reads, in pertinent part:
 In all cases where loss occurs and the insurer liable therefor fails to pay the same within the time specified in the policy, after demand made therefor, the insurer is liable to pay the holder of the policy, in addition to the amount of such loss, 12% damages upon the amount of the loss, together with all reasonable attorney's fees for the prosecution and collection of the loss.

claim. The Policy further outlines that the insured must provide the insurance company with notice, and a written particularized accounting of the loss.

The evidence indicates that SSI and the Youngs were familiar with the written claim requirement, having submitted the Nu'uuli store damaged windows claim, and a detailed restaurant contents claim. However, for no apparent reason, other than their own folly, SSI and the Youngs failed to file the requisite *written* demand or claim for other coverage under Policy 720. Because they failed to submit a demand or claim, as prescribed by statute, and outlined in their agreement, SSI and the Youngs are precluded from complaining that Progressive was untimely in paying such unspecified claims under Policy 720.

Additionally, SSI and the Youngs argue that Progressive violated A.S.C.A. § 29.1577 by filing this interpleader action, rather than paying them the $100,000 fire/material damage policy on the restaurant building. While the legislature intended that A.S.C.A. § 29.1577 provide a mandatory penalty against a late paying insurer, they did not mean to curtail an insurer's right to seek court intervention in situations where a claim is reasonably disputed. The indeterminate nature of insurance policies, written in the present-day to protect against the risk of loss or damage upon the happening of a future possibility, renders such contracts especially susceptible to challenge. Given the potentially contentious nature of such contracts, court action, especially in the form of an interpleader action, is often the most efficient method for resolving such disputes.

On the other hand, court resolution of any dispute is often a lengthy and expensive process, resulting in further injury to the already injured or damaged insured. An insurer must, therefore, proceed cautiously, and resort to court action only after having made a good faith attempt to resolve a disputed claim. Otherwise, an insurer that fails to make a good faith attempt to resolve a disputed claim, and abuses the judicial process by filing an interpleader complaint to deliberately avoid payment of a legitimate claim will be found in violation of A.S.C.A. § 29.1577.

The question then is whether Progressive was warranted in filing this interpleader action, instead of paying SSI and the Youngs the restaurant building $100,000 fire/material damage policy. The short answer is yes.

Faced with multiple claims of interest in the $100,000 proceeds, and a failed good faith effort at reaching an independent settlement of the Policy funds, Progressive was justified in filing this interpleader action. In fact, Progressive accurately questioned the interest that SSI, the

Youngs, and Fata shared or, as the case is with SSI, did not share, in the $100,000 proceeds. Progressive's act of depositing with the Court the Policy 720 proceeds it then considered undisputed further supports the reasonableness of their conduct in this case.

## 2. Bad Faith

■ We have previously acknowledged that, in addition to the statutory remedy afforded in A.S.C.A. § 29.1577, a tort cause of action exists in American Samoa for bad faith delay in paying insurance claims. *Paisano's Corp. v. Nat'l Pac. Ins.*, 30 A.S.R.2d 139 (Trial Div. 1996). However, due to the limited nature of the question before us in the *Paisano's* case, we did not address the applicable standard of care in bad faith cases.

■ A leading case on the standard of care in bad faith actions is *Anderson v. Continental Insurance Company*, 271 N.W.2d 368 (Wis. 1978). *See Braesch v. Union Ins. Co.*, 464 N.W.2d 769, 778 (Neb. 1991). To prevail on a bad faith claim, the *Anderson* court concluded that the insured must demonstrate twofold "the absence of a reasonable basis for denying benefits of the policy[,] and the . . . [insured's] knowledge or reckless disregard for denying the claim." *Anderson*, 271 N.W.2d at 376.

■ In discussing the first prong of the test, the *Anderson* court emphasized that the tort of bad faith can only succeed upon a showing of "the absence of a reasonable basis for denying the claim, *i.e.*, would a reasonable insurer under the circumstances have denied or delayed payment of the claim under the facts and circumstances." *Id.* at 377.

We favorably adopt the *Anderson* standard as it "strikes the proper balance between the respective rights of the insurer and the policyholder." *Braesch*, 464 N.W.2d at 778.

SSI and the Youngs, in uncertain terms, allege that Progressive failed to reasonably investigate and settle coverage within the policy limits, and, more generally, were indifferent to the insured's interests. After the fire, there was undoubtedly a great deal of confusion regarding Policy 720 coverage. Progressive's custom of providing the insured with a piecemeal policy, and failing to explain the meaning of the coverage terms contained in each document certainly did nothing to alleviate the confusion. For example, rather than explain to the Youngs that Policy 720 was subject to average, the subject to average clause was merely included in the last received Summary document.

131

Insurance companies legitimately, and commonly limit their liability by including certain clauses in their policies, like the subject to average clause. However, an insurance company is required to include the conditions of insurance, as well as other pertinent information, in its policy of insurance. *See* A.S.C.A. § 29.1533. Providing the insured with a piecemeal policy, even one which outlines all the requisite information, does not promote the underlying intent of A.S.C.A. § 29.1533, a law designed to ensure that the insured know exactly what coverage they are paying for. Notwithstanding that Progressive's untidy policy issuance procedures may provide a basis to avoid later slipped-in contract clauses, there was no showing in this case that Progressive's method of issuing Policy 720 amounted to bad faith delay in paying on the Policy.

Furthermore, upon review of Progressive's conduct in handling the various claims after the fire, we find that Progressive promptly investigated all demands properly brought to its attention, and paid the legitimate claims in accordance with the terms of Policy 720. The only claim delayed was the present claim, which Progressive promptly filed with the Court.

Progressive paid SSI and the Youngs the Nu'uuli store windows claim, and the restaurant contents claim without dispute. Other unspecified claims, such as an alleged claim for coverage under the extensions clause, and an alleged claim for damage to other portions of the Nu'uuli store, were never brought to Progressive's attention as prescribed by the Policy. As discussed in the preceding section, the terms of Policy 720 require that SSI and the Youngs notify Progressive in writing, and provide Progressive with a particularized accounting of the damage. SSI and the Youngs may not now complain that Progressive failed to pay these claims in bad faith after it failed to comply with these basic policy requirements.

With regards to the restaurant building $100,000 fire/material damage Policy, the evidence before us demonstrates that Progressive employed Thew, to investigate and evaluate the damage to the restaurant building, and denied extended coverage upon Thew's opinion and conclusion, which opinion it made known to the parties.

While we question Thew's credibility, and a quantity surveyor's ability to assess structural damage in general, as we discuss further below, there was no evidence to show that Progressive purposefully employed Thew to deny the Youngs coverage. Prior to Progressive's employment of Thew, to assess the restaurant building damage, Progressive was only aware that Thew had been employed on previous occasions to perform the same type of work.

Furthermore, there is no evidence to suggest that Progressive attempted to leverage payment of the restaurant building $100,000 fire/material damage policy portion of Policy 720 with settlement of other unspecified coverage under the Policy. Instead, when it became obvious that payment of the restaurant building coverage under Policy 720 could not be amicably resolved amongst the parties, Progressive resorted to this interpleader course of action, and seasonably deposited what it considered to be the disputed amount, $64,300, with the Court.

E. Fata's Cross Claim for Indemnification

Fata avers that she is entitled to indemnification from the Youngs for the damage to the restaurant building under the terms of the Lease agreement. The applicable provision of the June 24, 1998 Lease agreement provides:

> Lessee hereby covenants and agrees to indemnify and hold harmless the Lessor for losses and/or injury to Lessor's property, or any liability assessed against Lessor as owner of the building, by reason of negligence or intentional acts of Lessee or its agents, or by reason of the violation of the Lessee's warranties herein described.

█ Premised upon the doctrine of *respondeat superior,* the Youngs expressly promised to incur liability, regardless of their own fault, for the negligent or intentional conduct of their agents or employees. We have previously acknowledged the reasoning in support of the doctrine of *respondeat superior.*

> "The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business. They are placed on the employer because, having engaged in an enterprise, which will on the basis of all past experience involve harm to others through the torts of employees, and sought to profit by it, it is just that he, rather than the innocent injured plaintiff, should bear them; and because he is better able to absorb them, and to distribute them, through prices, rates or liability insurance to the public, and so to shift them to society, to the community at large."

*Garcia v. Galea`i d.b.a. Paradise Travel Inc., et al.,* 15 A.S.R.2d 14, 18 n.2 (Trial Div. 1990) (quoting PROSSER AND KEATON ON TORTS 500-01 (5th ed. 1984)).

The Youngs tenuously try to avoid liability under the indemnification clause of the Lease, arguing that the restaurant employee that caused the fire was not employed by the Youngs, since SSI was the entity doing business as the Hong Kong restaurant. Their argument is entirely without merit.

The Youngs contracted with Fata to indemnify her, and cannot now avoid responsibility by contending that SSI, not the Youngs, employed the restaurant workers. As discussed *supra*, SSI is a questionable entity created solely to sponsor the Hong Kong Restaurant's alien employees. Even if the Youngs created SSI to run the restaurant business and take over the leased premises, SSI and its employees remain the Youngs' agents or employees for purposes of the indemnification clause in the Lease.

We, therefore, find that the building was razed owing to a negligent agent or employee of the Youngs, and now Fata no longer has a building. Therefore, in accordance with their promise to indemnify Fata, the Youngs must pay Fata the value of the entire building as it stood prior to the fire.

At trial, Fata's counsel inexplicably offered no independent evidence as to the value of the building. Furthermore, as discussed below, given our serious reservations respecting Thew's reported conclusions, we do not find his estimate of the building value useful, other than for the limited purpose of determining whether or not a total loss was sustained.

Nonetheless, the Youngs admitted, and Progressive agreed, that prior to the fire, the building was worth at least $100,000, as they proceeded to write insurance for this amount. Therefore, the Youngs are liable to reimburse Fata in the amount of the proceeds recoverable from the $100,000 restaurant building policy.

F. Recoverable Amount

The applicable statute in American Samoa, A.S.C.A. § 29.1539, requires that policies written on real property for fire insurance must be valued policies.[15] If a total loss occurs under a valued policy, the stated

---

[15] A.S.C.A. § 29.1539 reads:
A policy is either an open policy, which is one wherein the value of the subject matter is not agreed upon but is left to be ascertained in case of loss, or a valued policy, which is one containing on its face an expressed agreement that the thing insured shall be valued at a specified sum. An open policy must not be written on real property for fire insurance.

value of the policy is conclusive, and the insured is entitled to such full value. *See* COUCH, *supra*, at § 54:104. While the courts differ on the extent of destruction required to constitute a total loss, they generally concur that a building need not be totally annihilated before constituting a total loss. *Id.* at § 54:57. A number of courts take the position that there cannot be a total loss so long as the remnant of the structure standing is reasonably adapted for use as a basis upon which to restore the building to the condition in which it was before the fire. *Id.* at § 54:62. Furthermore, the question of whether it is so adapted depends upon whether a reasonably prudent owner, uninsured, desiring such a structure as the one in question was before the fire, would in proceeding to restore it to its original condition utilize such remnant as such basis. *Id.*; *see also Div. of Gen. Servs. v. C.E. Ulmer*, 183 S.E.2d 315, 317 (S.C. 1971) (economic feasibility of reconstructing building, utilizing remains as basis for reconstruction, sustains finding that loss was partial).

Regardless of the method used to determine the extent of damage to a building, the question of the existence of total loss is a question of fact. *See id.*; *Bennett v. Imperial Ins. Co.*, 606 S.W.2d 7, 9 (Tex. 1980). The only expert evidence tendered in this case was that of Hammish Thew, a "quantity surveyor." Thew concluded that the remnants of the Hong Kong restaurant building could be used to rebuild upon, and therefore opined that the loss sustained was partial. He then assessed various costs for the reconstruction, using different methods to itemize the materials and labor needed to build the restaurant to its original condition. While we do not doubt Thew's ability to measure quantities of work and material for construction projects, we are not convinced that a quantity surveyor, and Thew, in particular, has the requisite expertise to determine the structural soundness of a building's remains after the building has been destroyed by fire.

 To assist in its fact-finding mission, a trial court may rely upon scientific, technical, or other specialized knowledge in the form of an expert's opinion. However, the opinion must necessarily "assist the trier of fact to understand the evidence or to determine a fact in issue." T.C.R.Ev. 702. Obviously, an irrelevant and unreliable opinion will not aid the Court in making its decision.

> [T]he Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands.

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993) (leading case interpreting F.R.E. 702, which is paralleled by T.C.R.Ev. 702).

Thew is neither an architect nor a structural engineer with the requisite training and expertise to credibly evaluate and assess the state of a cement building's remnants after having been cooked in a conflagration of the magnitude that destroyed the restaurant building. Although Thew attested to having previously appraised other fire damage claims, he did not elaborate on the methodology he used during those evaluations. Nor did he otherwise convince us that he had accumulated sufficient experience that would qualify him to evaluate the structural integrity of what remained of the restaurant building.

■ In addition, we are not satisfied that Thew's methodology met with T.C.R.Ev. 702 requisites. In *Daubert*, the Supreme Court explained that in order to meet the rule's reliability requirement, an expert's opinion must be premised upon a technique which is scientifically valid. To be scientifically valid, a trial court must determine whether the technique has been tested, subjected to peer review and publication, has a known or potential rate of error, and, finally, has been generally accepted by recognized experts in the field. *Daubert*, 509 U.S. at 593-94.

Thew premised his partial loss conclusion upon a nail scoring technique he acquired from an anecdotal experience in Fiji. There was no evidence that Thew's nail scratching methodology had been tested, reviewed or otherwise accepted as a scientific basis for assessing structural damage done by a fire. A fire that destroys a building and all of its contents, leaving behind only concrete-made walls, slab, and foundation, is undoubtedly intense. One would naturally expect that any technique used to determine whether such cooked concrete may be used to rebuild the same structure would necessarily involve more than Thew's superficial evaluation.

Without Thew's partial loss assessment, the only evidence we have before us regarding the extent of damage to the building is Thew's calculations regarding the rebuilding costs of the restaurant building. We are not, however, without serious reservations as to the objectivity of Thew's conclusions given his explicit inclination to "massage" figures in his client's favor. Some of the figures were, in fact, modified at least three times to the benefit of Progressive. With these reservations in mind, we evaluate Thew's calculations for the limited purpose of determining the extent of the loss sustained to the restaurant building.

In light of Thew's acknowledged bias, and thrice modified repair estimate values, we find Thew's repair estimate values suspect. However, while the repair estimate value changed, the residual value remained estimated at $93,605. Depending upon the estimated total

building value applied,[16] the residual value, translated into percentages, shows that at least 84% to 77% of the building had been turned to ash, with the remaining 16% to 23% having been subjected to a destructive fire.

With this in mind, we find that a reasonably prudent owner, uninsured, desiring a restaurant building as the one in question was before the fire, would *not* in proceeding to restore it to its original condition utilize its remnant as such basis. Notably, the Youngs did not rebuild upon the remaining concrete parts, razing them and building a new, albeit larger, structure from scratch. We find that the restaurant building was totally destroyed, and, therefore, conclude that Progressive is liable to pay the value of the $100,000 fire/material damage restaurant building policy.

### Order

In accordance with the Youngs' promise to indemnify Fata for the loss of the Hong Kong restaurant building, and Progressive's $100,000 contract for insurance on said property, Progressive shall pay Fata the total value of the $100,000 fire/material damage restaurant building policy.

Accordingly, the Court shall issue Progressive's deposited funds of $64,300 to Fata, and Progressive must pay Fata the difference of $35,700. Any accumulated interest on the $64,300 court deposited proceeds shall be paid to Fata.

The payment to Fata of the insurance proceeds releases the Youngs from any and all liability on their promise to indemnify Fata. Judgment will enter accordingly.

It is so ordered.

---

[16] Again, the total value of the building was modified at least twice in favor of Progressive. According to Thew's first report, the total value of the building was $121,000. However, in a subsequent report, the value of the building was decreased to $111,000.